No. 5-96-0488

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_________________________________________________________________

KATE EHLERS,                   )  Appeal from the 

                                  )  Circuit Court of 

     Plaintiff-Appellant,         )  Jackson County.  

                                  )  

v.                                )  No. 95-MR-40

                                  )

JACKSON COUNTY SHERIFF'S MERIT    )

COMMISSION; RICHARD A. GREEN,     )

Chairman, KENT PARRISH, and       )

KENNETH GARRET, Members of the    )

Jackson County Sheriff's Merit    )

Commission; and WILLIAM KILQUIST, )

Sheriff of Jackson County,        )

                                  )  Honorable

                                  )  E. Dan Kimmel,

     Defendants-Appellees.        )  Judge, presiding.

_________________________________________________________________

JUSTICE HOPKINS delivered the opinion of the court:

Kate Ehlers, plaintiff, appeals from an order of the Jackson County circuit court affirming an order of the Jackson County Sheriff's Merit Commission (Merit Commission), which terminated plaintiff's employment as a jail officer and sergeant with the Jackson County Sheriff's Department.  In this administrative review case, we consider whether Ehlers was entitled to request union representation at an investigatory interview conducted by the Jackson County sheriff, William Kilquist, plaintiff's employer.  We hold that, under the circumstances of this case, Ehlers had a right to request union representation at the meeting in question and that the Merit Commission acted arbitrarily by discharging Ehlers for asserting her right in this regard.

FACTS

On January 7, 1995, Sheriff Kilquist suspended Ehlers without pay and filed a complaint with the Merit Commission, requesting a hearing on the following disciplinary charges against Ehlers:  

"A)  On or about Tuesday, January 3, 1995[,] not fully and/or truthfully complying with the order of her Lieutenant (Jacquot) to  produce for the Complainant Sheriff a report as to how many times her husband was at the Jackson County Sheriff's Department, how long he had stayed, how many times she was outside the Jail and the amount of times she was out of the Jail while she was on duty on December 26, 1994[,] and working a duty tour at the Jackson County Jail.

B)  On or about Thursday, January 5, 1995, giving a less than truthful and/or accurate typed report to the Complainant Sheriff regarding how many times her husband had been to the Jackson County Jail and the amount of time she was out of said Jail while she was on duty and at the said Jail complex on Monday, December 26, 1994, and further on said report writing the words `
I am making these statements under duress
' and further that the Respondent did deliver said January 5, 1995[,] document to the Complainant Sheriff while accompanied by on[-]duty Jackson County Jail Officer George Schaefer acting as a witness for Respondent as requested by Respondent.

C)  On or about Thursday, January 5, 1995[,] at about 11:15 a.m. at or near the Complainant Sheriff's office and immediately after Respondent had delivered to the office of the Complainant Sheriff the report mentioned in (B) of this writing, Respondent did refuse to obey the verbal order to her by the Complainant Sheriff to stay and talk to the Complainant Sheriff about the subject matter mentioned in (A) and (B) of this writing and Respondent did further claim that she was being harassed and did further state that she would not talk to the Complainant Sheriff in the absence of the on[-]duty Jackson County Jail Officer George Schaefer."  (Emphasis added in complaint.)  

On February 2, 1995, the Merit Commission conducted a hearing in which the following relevant evidence was presented:  Ehlers testified that she was working the day shift on December 26, 1994.  Her husband came to the jail in the afternoon, and they went outside to smoke cigarettes.  Ehlers estimated that they were outside about 10 minutes.  While outside, she was wearing her radio and it was turned on so that someone inside the jail could reach her if necessary.  After the cigarette break, she came back in the jail and went back to work.  Other jail officers testified that it was not unusual for jail officers to go outside the jail to smoke cigarettes while on duty. 

On January 3, 1995, Sergeant Ehlers' immediate supervising officer, Lieutenant Earl Jacquot, told her that the sheriff wanted a written statement from her about when her husband was at the jail on December 26, how many times he was there, and how long he stayed.  In response to Jacquot's request, Ehlers submitted the following statement to the sheriff:

"This statement is being made as per ordered by Sheriff Kilquist and as advised to me by Lt. Earl Jacquot.

On December 26, 1994, to the best of my knowledge and recollection, my husband, Curt Ehlers, came to the Jail one time during the afternoon hours."

Ehlers testified that the reason her first statement contained so little information was that she did not recall how long her husband had been at the jail on December 26.  Ehlers testified that Jacquot asked her to rewrite the report to provide the additional details, but she told Jacquot that she did not remember.  Jacquot told her she had to write something anyway.  Ehlers then submitted the following as her second statement:  

"On December 26, 1994, to the best of my knowledge and recollection, my husband, Curt, came to the Jail one time during the afternoon hours for a short period of time.

I was out of the Jail at 1255 hours and back in at 1305 hours and out at 1440 hours and back in at 1450 hours of the 26th of December, 1994, as is recorded in the Central Control Officers log (see attached) on that date.  I would note that the portion of the log from which these times are taken has been scribbled through several times."

After her signature, Ehlers wrote, "I am making these statements under duress."

After drafting the second statement, Ehlers telephoned her union representative, but he was not available.  Ehlers testified that she wanted to talk to the union representative because she felt that some kind of disciplinary action was going to be taken against her and she was concerned for her job.  Jacquot testified that before December 26, he told Ehlers that she was spending too much time outside on cigarette breaks.  

Sheriff Kilquist testified that on January 5, 1995, he requested Ehlers to bring the second statement to his office.  Ehlers testified that when the sheriff called her, she told him she felt she was being harassed, but the sheriff told her she was not being harassed.  Before Ehlers went to the sheriff's office, she asked Officer George Schaefer to come with her as her union representative.  Ehlers testified that she felt she needed a union representative present because she believed that her job was in jeopardy.  

Ehlers, Schaefer, and Sheriff Kilquist all testified about this meeting, and their testimony is not contradictory.  After Ehlers and Schaefer arrived at the sheriff's office, Ehlers placed the second report on the sheriff's desk.  Sheriff Kilquist asked Ehlers to stay and sit down because he wanted to talk to Ehlers, but he told Schaefer to leave.  Ehlers responded that she would rather stand and that she wanted Schaefer present as her union representative.  Sheriff Kilquist again ordered Schaefer to leave.  Schaefer left.  Ehlers told the sheriff again that she would not talk to him without a union representative, and she turned to leave.  Sheriff Kilquist told Ehlers that if she left, he would fire her.  Ehlers left.  The sheriff suspended Ehlers without pay and filed the complaint seeking her dismissal.

The Merit Commission determined that the sheriff presented insufficient evidence to sustain the allegations of paragraph A and B of the sheriff's complaint, which alleged that Ehlers submitted inaccurate or untruthful statements to the sheriff, but found that paragraph C, concerning Ehlers' refusal to talk to the sheriff, was sustained by the evidence.  

On May 17, 1995, the Merit Commission held a hearing to determine what type of discipline should be imposed upon Ehlers for her refusal to talk to the sheriff.  The Merit Commission found that the sheriff lawfully ordered Ehlers to sit in his office and talk to him and that Ehlers' refusal to obey the sheriff's order amounted to insubordination.  The Merit Commission decided to discharge Ehlers from her employment effective January 7, 1995.  The Merit Commission made no finding regarding Ehlers' right to have a union representative present at the January 5, 1995, meeting with the sheriff.

On June 23, 1995, Ehlers filed a complaint for administrative review, asking the Jackson County circuit court to overturn the Merit Commission's decision terminating her employment.  On July 1, 1996, the court entered an order affirming the Merit Commission's decision, finding that it was not contrary to the manifest weight of the evidence.  In the order, the court stated, in relevant part, as follows:

"In reviewing the Jackson County Merit Commission's decision to discharge Plaintiff, the Court must affirm that determination unless it was `arbitrary and unreasonable or unrelated to the requirements of the service'.  
Launius v. Board of Fire and Police Commissioners of Des Plaines
, 151 Ill. 2d 419 [(1992)].  Discharge of Plaintiff for her direct disobedience of Sheriff Kilquist's order cannot be characterized as arbitrary or unreasonable, and the decision of the Jackson County Sheriff's Merit Commission to discharge Plaintiff is affirmed."  

The court did not determine whether Ehlers was entitled to have union representation at the January 5, 1995, meeting with the sheriff.  This appealed followed.

ANALYSIS

On appeal, Ehlers argues that the sheriff's order that she remain in his office and talk to him without union representation was an unlawful order and that she cannot be discharged for failure to follow an unlawful order.   We agree.  

Under the Sheriff's Merit System Law (55 ILCS 5/3-8014 (West 1992)), Ehlers could not be "removed, demoted or suspended except for cause, upon written charges filed with the Merit Commission by the sheriff."  "Cause" under this statute and other similar statutes has been defined as "some substantial shortcoming" which renders the employee's continuance in his office or employment "in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause" for the officer's discharge.  
Launius v. Board of Fire & Police Commissioners of Des Plaines
, 151 Ill. 2d 419, 435 (1992). 

 Our review of a decision involving the discharge of an employee, entered by an administrative body such as the Merit Commission, is a two-step process.  First, we must determine whether the Merit Commission's finding that Ehlers refused to talk to the sheriff on January 5, 1995, is contrary to the manifest weight of the evidence.  
Walsh v. Board of Fire & Police Commissioners of Orland Park
, 96 Ill. 2d 101, 106 (1983).  In this case, the first step is simple.  The evidence is clear that Ehlers refused to talk to the sheriff.

The second step of the inquiry is to "determine if the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist."  
Walsh
, 96 Ill. 2d at 106.  The Merit Commission's determination of cause for Ehlers' discharge is not 
prima facie 
true or correct, as are its findings of fact, and its decision regarding cause is not entitled to the same deference as its findings of fact.  
Styck v. Iroquois County Sheriff's Merit Comm'n
, 253 Ill. App. 3d 430, 438 (1993).  The Merit Commission's finding in regards to cause is to be respected by the court and should be overturned only if it is "arbitrary and unreasonable or unrelated to the requirements of the service."  
Launius
, 151 Ill. 2d at 435. 

We next consider whether Ehlers was entitled to union representation at the January 5, 1995, meeting with Sheriff Kilquist.  Section 6(a) of the Illinois Public Labor Relations Act provides in pertinent part:

"Employees of the State and any political subdivision of the State *** have, and are protected in the exercise of, the right of self-organization, and may form, join or assist any labor organization, *** 
to engage in other concerted activities not otherwise prohibited by law for the purposes of collective bargaining or other mutual aid or protection, free from interference, restraint or coercion
."  (Emphasis added.)  5 ILCS 315/6(a) (West 1992).  

The parties agree that Ehlers is an employee covered under this statute.  Where the parties differ is in their interpretation of the statute's grant of the right "to engage in other concerted activities *** for the purpose[] of *** other mutual aid or protection."  5 ILCS 315/6(a) (West 1992).  Ehlers argues that the Illinois State Labor Relations Board (the Labor Relations Board) has construed this language to provide employees like Ehlers with "the right to refuse to submit to an investigatory interview without union representation where the employee reasonably fears that the interview might result in discipline."  State of Illinois (Departments of Central Management Services and Corrections) and Gerald Morgan, 1 Pub. Employee Rep. (Ill. Ed.) ¶2020 (1985).  The sheriff argues vehemently that the Morgan case does not apply, but even if it does, it is not binding upon this court, and we should reject it as contrary to Illinois law.  The sheriff's arguments are without merit.  

The right referred to in the Morgan case is known as the "
Weingarten
 right," in reference to the United States Supreme Court case, 
National Labor Relations Board v. J. Weingarten, Inc.
, 420 U.S. 251, 43 L. Ed. 2d 171, 95 S. Ct. 959 (1975).  In the Morgan case, the Labor Relations Board determined that section 6 guarantees employees covered under the Illinois Public Labor Relations Act (Illinois Act) the same rights enjoyed by private employees under section 7 of the National Labor Relations Act (National Act) (29 U.S.C.A. §157 (West 1973)) and discussed in 
Weingarten
.  The sheriff argues that 
Weingarten
 and the provisions of the National Act are inapplicable to this case, since the National Act applies only to private employees, whereas the Illinois Act applies only to public-sector employees.

The  distinction between private employees covered under the National Act and public employees covered under the Illinois Act is not controlling.  Section 6 of the Illinois Act mirrors section 7 of the National Act.  Section 7 of the National Act provides that employees covered under that act "shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, 
and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ***
."  (Emphasis added.)  29 U.S.C.A. §157 (West 1973).  "The [Illinois Act] was passed based on the [National Act] and, thus, where similar in language, can be interpreted in conformity with Federal decisions."  
County of Kane v. Illinois State Labor Relations Board
, 165 Ill. App. 3d 614, 620 (1988).  

The sheriff is correct that Federal labor law decisions such as 
Weingarten
 are not binding on Illinois courts interpreting Illinois statutes, but Federal court decisions and National Labor Relations Board decisions are often illuminating.  
County of Cook v. Illinois Local Labor Relations Board
, 266 Ill. App. 3d 53, 58 (1994).  The same is true for the Morgan case, which was not appealed to the appellate court, and so is not binding upon this court or the trial court, but which is illuminating and persuasive nonetheless.      

In the Morgan case, a correctional officer, Gerald Morgan, refused to answer, without a union representative present, an investigator's questions about an incident involving Morgan and two other officers.  After the interview was terminated, Morgan was discharged from his job, in part, for his refusal to cooperate with the investigation.  The Labor Relations Board found that Morgan had the right to refuse to submit to the interview, and the Board based its decision upon the Supreme Court's decision in 
Weingarten
.  We find the following excerpt from the Labor Relations Board's decision in Morgan persuasive:

"[T]he 
Weingarten
 right[] arises because the employee, in seeking the assistance of his union representative, seeks `mutual aid or protection' against a perceived threat to his employment security.  The union representative is therefore present to safeguard not only the individual employee's interest, but also the interests of all members of the bargaining unit, by ensuring that the employer does not initiate or continue a practice of unjustly imposing punishment.  We find that the right arises only where the employee specifically makes such a request, and the representative's role is limited to assisting the employee, clarifying the rights and suggesting other employees who may have knowledge of the facts.

We also conclude that the Employer is not obligated to automatically provide union representation upon request.  The employer may deny the request, discontinue the interview and proceed to obtain information from other sources.  ***  [I]f the employee requests representation and the request is denied, the employer cannot continue the interview without violating the [Illinois Act].  If it disciplines the employee for 
refusing
 to continue in the absence of representation the employer is, in effect, retaliating against the employee 
because
 he has engaged in protected concerted activity, and such conduct is clearly violative of section 10(a)(1) [of the Illinois Act (5 ILCS 315/10(a)(1) (West 1992))]."   (Emphasis in original.)  Morgan, 1 Pub. Employee Rep. (Ill. Ed.) ¶2020, at VIII-120 (1985).

We find that the procedure and rationale expressed above is supported by 
Weingarten
 and the cases following it, such as 
National Labor Relations Board v. Illinois Bell Telephone Co.
, 674 F.2d 618 (1982).  Therefore, we hold that the Merit Commission acted arbitrarily and unreasonably in deciding to discharge Ehlers for requesting union representation at the meeting with Sheriff Kilquist.   

Sheriff Kilquist did not present any evidence to indicate that Ehlers' chosen union representative had compelling duties elsewhere such that his attendance at the interview would have endangered the operation of the jail.  Nor did the sheriff terminate the interview and collect information concerning Ehlers' activities through other means, even though, at the hearing before the Merit Commission, he presented a substantial amount of evidence about Ehlers' activities from sources other than Ehlers.   

The Merit Commission found that the sheriff's first two charges of misconduct were unfounded by the evidence.  The third charge, which the Merit Commission sustained, alleged only that Ehlers refused to talk to the sheriff outside the presence of the union representative.  The Merit Commission did not make any finding about the reasonableness of Ehlers' fear that the interview might end in discipline against her, so we are not overturning any factual findings of the Merit Commission by finding that Ehlers' fear in this regard was reasonable under the circumstances.  Those circumstances include the fact that Jacquot told Ehlers before December 26, 1994, that she was spending too much time outside the jail on cigarette breaks and that the request for the reports from Ehlers was unusual and unexplained.  Under these circumstances, we find that the Merit Commission should not have discharged or disciplined Ehlers for asserting her right to union representation at the January 5, 1995, meeting with Sheriff Kilquist.

The sheriff also argues that the Uniform Peace Officers' Disciplinary Act (50 ILCS 725/1 
et seq
. (West 1992)) (the Disciplinary Act) applies to this case.  According to the sheriff's argument, under the Disciplinary Act, Ehlers was not entitled to have union representation, because union representation is allowed only for formal interrogations, not for informal inquiries such as the one initiated by the sheriff on January 5, 1995.  We agree that Ehlers is covered by the terms of the Disciplinary Act but disagree that it deprives Ehlers of her right to union representation under the facts of this case.

The Disciplinary Act defines an informal inquiry as "a meeting by supervisory or command personnel with an officer upon whom an allegation of misconduct has come to the attention of such supervisory or command personnel, the purpose of which meeting is to *** discuss the facts to determine whether a formal investigation should be commenced."  50 ILCS 725/2(b) (West 1992).  A formal investigation is "the process of investigation ordered by a commanding officer during which the questioning of an officer is intended to gather evidence of misconduct which may be the basis for filing charges seeking his or her removal, discharge or suspension in excess of three days."   50 ILCS 725/2(c) (West 1992).  Under section 3.9 of the Disciplinary Act, the officer who is the subject of a formal investigation has a right to have an attorney present, and if "a collective bargaining agreement requires the presence of a representative of the collective bargaining unit during investigations, such representative 
shall
 be present during the interrogation, unless this requirement is waived by the officer being interrogated."  (Emphasis added.)  50 ILCS 725/3.9 (West 1992).

The sheriff argues that when he asked Ehlers to talk to him, this was only an informal interview, not a formal interrogation. The sheriff testified that when he asked Ehlers to talk to him, he had no intention of firing or disciplining her but wanted only to find out what happened on December 26, 1994.  The sheriff claims that since the interview was not a formal interrogation under the statutory definition, Ehlers was not entitled to union representation and her refusal to talk to him was insubordination serious enough to warrant discharge.  We agree that under the terms of the Disciplinary Act, the interview Sheriff Kilquist requested was more in the nature of an informal inquiry than a formal investigation under the statutory definitions.  However, we disagree that Ehlers had no right to union representation, even at this informal interview.

Under the terms of section 3.9 of the Disciplinary Act, a covered officer is guaranteed union representation at a formal interrogation, if the applicable collective bargaining agreement provides for it and the officer does not waive the right.  In contrast, under 
Weingarten
 as construed in Morgan, a union employee has a right to 
request
 union representation if the employee 
reasonably believes that discipline may result
 from the interview.  The standard announced in 
Weingarten
 and adopted in Morgan is different from and in addition to the guaranteed right of union representation set forth in section 3.9 of the Disciplinary Act.  The Disciplinary Act does not subtract Ehlers' 
Weingarten
 right to union representation upon request in an informal inquiry but merely adds an additional guarantee of union representation in formal investigations.  See 
Weingarten
, 420 U.S. at 267, 43 L. Ed. 2d at 184, 95 S. Ct. at 968-69.  

CONCLUSION

For all of the reasons stated, we reverse the circuit court's affirmance of the Merit Commission's decision discharging Ehlers for cause.  The only basis for Ehlers' discharge was that she asserted her right to union representation, a right which we find protected under the circumstances of this case.  Therefore, pursuant to Supreme Court Rule 366(a)(5) (155 Ill. 2d R. 355(a)(5)) we order that Ehlers be restored to her former employment status, with the same benefits she would have had if she had not been discharged by the Merit Commission, as of the effective date of her discharge, and we remand for further proceedings consistent with this opinion.

Reversed and remanded.    

CHAPMAN, J., and GOLDENHERSH, J., concur.